The Honorable James L. Robart

1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
9               SEATTLE WASHINGTON

10

11  UNITED STATES OF AMERICA,          No. CR 11-0029JLR

12                 Plaintiff,          DEFENDANT'S      SENTENCING
                                       MEMORANDUM
13      vs.

14  CHARLES TURNER HABERMANN,

15                 Defendant.

16

17      Charles Turner Habermann, by and through his counsel of record, William J. Kopeny

18  and Jennifer Horwitz, hereby files his sentencing Memorandum.

19

20  Dated:  August 8, 2011

21                                     Respectfully submitted,

22                                            /S/

23
                                       _____
24                                     WILLIAM J. KOPENY, and

25                                            /S/

26                                     _____
                                       JENNIFER HORWITZ
27
                                       Counsel of Record for Defendant
28                                     CHARLES TURNER HABERMANN

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 1

# **Table of Contents**

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - i

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1

## **Table of Authorities**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - ii

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1

## Exhibits to Defendant's Sentencing Memorandum

2

3    C.V. of Dr. Michael C. Leitman, Ph.D.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4    Report of Dr. Leitman, Ph.D.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5    Letter - Dr. Elwood Cohen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6    Letter - Martin Breiner (former Police Officer). . . . . . . . . . . . . . . . . . . . . . . . 4

7    Letter - Beth Kelly, Ph.D. (Professor, DePaul University).. . . . . . . . . . . . . . . . 5

8    Letter - Margie Habermann (Defendant' Mother). . . . . . . . . . . . . . . . . . . . . . . 6

9    Letter - Robert Habermann   (Defendant's Father).. . . . . . . . . . . . . . . . . . . . . . 7

10    Letter - Whitney Oppenheimer (Defendant's Sister). . . . . . . . . . . . . . . . . . . . . 8

11    Letter - Jon Oppenheimer, Esq. (Defendant's Brother-in-law). . . . . . . . . . . . . 9

12    Letter - Jason Ortiz. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

13    Letter - Michele Miller (Neighbor).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

14    Letter - Nicole McCurdy (Friend).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

15    Letter - Bradley Aylward (Friend). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

16    Letter - Brian Gabrysiak. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

17    Mr. Habermann's Statement Accepting Responsibility. . . . . . . . . . . . . . . . . . 15

18    Mr. Habermann's Letter of Apology to victim and his staff. . . . . . . . . . . . . . . 16

19    Excerpt from FBI Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

20    Transcript of December 10, 2010, 3:51 a.m. call to Congressman DeFazio. . . . . 18

21    Complaint in *U.S. v. Charles Wilson*, CR10-130JCC. . . . . . . . . . . . . . . . . . . 19

22    Government's Sentencing Memorandum, *U.S. v. Wilson*, CR10-130-JCC. . . . . . 20

23    Defendant's Sentencing Memorandum, *U.S. v. Wilson*, CR10-130-JCC. . . . . . . . 21

24    Declaration of William J. Kopeny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

25    Partial Transcript of 5/27/11 Detention Hearing in Central District. . . . . . . . . . . 23

26

27

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - iii

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CHARLES TURNER HABERMANN,

Defendant.

No. CR 11-0029JLR

DEFENDANT'S   SENTENCING
MEMORANDUM

Charles Turner Habermann, by and through his counsel of record, William J. Kopeny and Jennifer Horwitz, hereby files his sentencing Memorandum. For the reasons set forth below, Defendant respectfully recommends that the Court impose an alternative sentence of treatment, a fine and restitution, in lieu of any custody sentence. The Pre-Sentence Report of the United States Probation Officer ("PSR") and cover letter recommendation suggests a sentenced of 6 months in custody. The Government's sentencing position is that Defendant should be sentenced to one year and one day in custody.

Defendant believes that if this Court determines that any additional confinement is appropriate in this case (in addition to the 18 days in custody he has served, and in addition to the approximately 7 months of home confinement he has completed), it should be in the form of home confinement.

DEFENDANT'S SENTENCING MEMORANDUM
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 1

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1  ## I.     <u>BACKGROUND</u>

2       Mr. Habermann is a 33 year old native of the Chicago, Illinois area.   He is the son of

3  the union of Robert Habermann and Marjorie Habermann.   His parents are affluent and the

4  family lived in a luxury apartment in Chicago.

5       The offense charged in this case is at the least serious range of crimes proscribed by

6  Title 18 U.S.C. § 115.   The statute criminalizes conduct ranging from mere words, with the

7  requisite intent all the way to murder of a federal official.   In the present case, there was no

8  violent conduct or act of violence, or attempted violence alleged or suspected on the part of

9  Mr. Habermann.

10      On December 9, 2010, Mr. Habermann had a bad day.   He had an argument with his

11 father and a disappointing broken first date with a young woman.   He became hurt and angry

12 and began to drink tequila.   He consumed between 400-800 ml. of alcohol and by the middle

13 of the night, while watching stock market related news on TV, he became angry at the

14 television and the statements of various Congressmen who wanted to roll back tax cuts on the

15 wealthy.   In this highly inebriated state he called Congressman McDermott's Seattle area

16 office.

17      Mr. Habermann made two 4-minute telephone calls from his home in Palm Springs,

18 California to the Seattle field office of United States Representative James A. McDermott.

19 The calls were one immediately after the other.   Mr. Habermann may have been cut off by the

20 answering machine before he called back.   In both calls, Mr. Habermann began by giving his

21 true name and his correct telephone number.   He started his message with general statements

22 about Congressman McDermott's political views, and those of persons who agree with him,

23 and ended each call with a vitriolic verbal attack and threats of death against Mr. McDermott

24 and his family.     The threatening language was horrible.   It did not extend to the

25 Congressman's staff, but the language of the calls is reprehensible.

26      Later that same morning, on December 10, 2010, at 3:51 a.m., still very intoxicated, Mr.

27 Habermann telephoned and left another very unpleasant message, this time for Congressman

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 2

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1   DeFazio.  A copy of the transcript of that call is attached as Exhibit 18 to this Sentencing

2   Brief.  That call, as unpleasant as it was, was not a threat but protected speech under well

3   established First Amendment principals most recently explained and restated by the Ninth

4   Circuit Court of Appeals in *United States v. Bagdasarian*, — F.3d —, 2011 WL 2803583

5   (C.A. 9 (Cal.). [Filed 7/19/11]. [Conviction for threats to kill the President reversed because

6   under all of the surrounding circumstances there was insufficient evidence the defendant had

7   a subjective intent to threaten the victim.]  Mr. Habermann explicitly stated he did not mean

8   to threaten anyone, and was not intending to actually hurt anyone.

9        In addition to these calls, Mr. Habermann made similar inexcusable calls to a State of

10  California elected official, however, in that case, Mr. Habermann called back to say that he

11  did not actually mean his threats, but only believed that the official was stupid and wrong

12  about his political views.  In that instance he also called back the next morning and

13  apologized, stated he has been intoxicated and again reiterated he had no intention of carrying

14  out any threat of harm to the official or anyone else.  See PSR, ¶18.

15       Mr. Habermann is a person who is suffering from several physical conditions as well

16  as a severe anxiety condition.  As a result of his upbringing, (discussed at length hereafter),

17  he developed a drug problem and as a middle school and high school student, he used cocaine,

18  ecstasy, mushrooms, marijuana and alcohol.  His history of drug use is accurately set forth in

19  the report of the United States Probation Officer on file herein.  By early 2009, he was intent

20  on quitting the use of dangerous drugs, and with his mother's help he voluntarily enrolled in

21  a Palm Springs drug program to stop using cocaine.   After one day, when he was told he

22  would be required to take a medication of which program personnel would not identify the

23  possible side effects for him, he left the program. See PSR, p. 7, ¶18.

24       However, he has <u>never</u> used cocaine since that time.[1]  Instead he found an apartment

25  in Palm Springs and has lived there ever since.  His intent in staying in Palm Springs was to

26  _____

27       [1] Numerous close friends confirm this fact.  Please see Exhibits 2, 4, 6, 7 & 8.
     These exhibits are discussed in more detail below.

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 3

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1  rid himself of his prior regular circle of friends.    These people were primarily drug users,

2  dealers and co-dependent associates of drug users.

3      On his own, Mr. Habermann began to become socialized in the Palm Springs area.  He

4  is self-employed because since his 30th birthday, he has made his living trading stocks in the

5  portfolio of securities given to him by his parents.    That portfolio is now worth over $3

6  million, however, he has a margin debt of just over $1 million, meaning his stock portfolio is

7  has a net worth of approximately $2 million to $2.5 million.

8      He is fiercely interested in the economy and politics and has had many arguments with

9  his close friends, professors, tutors, etc. regarding various issues related to the stock market

10 and politics.

11      Later in the day he made the call in question, December 10, 2010, Mr. Habermann was

12 at home, recovering from a hangover, when several FBI agents came to his door.  He let them

13 in without any resistence and consented to a search.  The agents searched his home and found

14 nothing indicating he was armed, or dangerous.  He voluntarily answered the agents' questions

15 and explained that he had been drunk and meant no harm to the Congressman.   He admitted

16 making a similar call to the office of another Congressman (where he left the message for

17 Congressman DeFazio) referred to above. See Exhibit 18, Transcript of Call to Rep. DeFazio.

18      The agents advised Mr. Habermann not to make any further calls threatening anyone,

19 and left him with a warning that this conduct is against the law.

20      Approximately five weeks later, Gabrielle Giffords, the Representative from Arizona,

21 and 18 others, were gunned down by a maniac.  The very next Court day, Mr. Habermann was

22 indicted and then arrested and brought to Court in the Central District of California.

23      He was released on bond.   When he appeared in this District he was again released on

24 bond.  In their sentencing brief, the Government concedes that Mr. Habermann is not any true

25 danger, but they write that this was learned only after "a thorough investigation that consumed

26 the time and resources of the justice system and law enforcement" that "there is no sign that

27 Habermann was actually planning to kill anybody." Government's Sentencing Brief, p. 4, lns.

28

13-15.  This is a questionable and curious statement because: (a) Mr. Habermann left his true identity on his calls to the Congressman; (b) the FBI was at his door later that same day [not an investigation that consumed much time or resources]; and (c) the FBI concluded after that one and only encounter that Mr. Habermann posed no threat, because they left his home with a warning.[2]

## II.    SENTENCING GUIDELINES CALCULATIONS

Defendant concurs with the United States Sentencing Guidelines Calculations set forth in the revised final presentence report.  Specifically, the total offense level is 15, Mr. Habermann's criminal history (zero points) places him in Criminal History Category I, and the advisory Sentencing Guidelines range is 18-24  months.[3]

## III.   REASONS FOR GRANTING A VARIANCE BELOW THE GUIDELINES RANGE

### A.    General Principles

Under the formerly mandatory Guidelines, a downward departure was permitted where the Court found atypical mitigating factors pursuant to the United States Supreme Court decision in *Koon v. United States*, 518 U.S. 81, 95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Each of the mitigating factors discussed in this brief is a sound basis for concluding that the Defendant here would be adequately punished with probation and home confinement for between 6-12 months instead of a custody sentence.

---

   [2]  This statement is very much like the statement in the Government's Sentencing Memorandum in the matter of *United States v. Wilson*, Case No. CR10-130JCC, prosecuted in this district in 2010.   However, there are major differences in the two cases, discussed in some detail later in this brief.

   [3]  The Government's Sentencing Position was filed *before* the PSR was revised and so it erroneously states that the Guideline Calculation in the PSR in this case is 24-30 months.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 5

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

Even when the Guidelines were mandatory, they did not displace the traditional role of the district court in bringing compassion and common sense to the sentencing process. *United States v. Williams*, 65 F.3d 301, 309-310 (2d Cir. 1995).

Following the decision of the United States Supreme Court in *Booker v. United States*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (*Booker*), however, the Ninth Circuit has explicitly sanctioned the use of previously discouraged and/or prohibited grounds for downward departures in determining the appropriate sentence under the advisory guidelines and as bases for granting a variance following the requirements of 18 U.S.C. § 3553(a).

> "District courts now also have the discretion to weigh a multitude of mitigating and aggravating factors that existed at the time of mandatory Guidelines sentencing, but were deemed 'not ordinarily relevant,' such as age, education and vocational skills, <u>mental and emotional conditions</u>, employment record, and family ties and responsibilities. See U.S.S.G. § § § § § 5H1.1-6; see also *Koon v. United States*, 518 U.S. 81, 95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) ('Discouraged factors ... are those not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range. Examples include the defendant's family ties and responsibilities, his or her educational and vocational skills, and his or her military, civic, charitable, or public service record.' (quotations and citations omitted)). Indeed, district courts may even consider factors that were precluded from consideration altogether prior to *Booker*, such as <u>drug and alcohol dependence</u>, <u>lack of guidance as a youth</u>, and personal financial difficulties and economic pressures." *United States v. Ameline*, 409 F.3d 1073, 1092 (9th Cir. 2005) (*Ameline*) [Underlining supplied.]

Since Booker, the United States Supreme Court has held that the Guidelines sentence does not enjoy a presumption that it is the correct or appropriate, or even the reasonable, sentence. *Rita v. United States*, – U.S. –, 127 S.Ct. 2456, 2464, 168 L.Ed.2d 203 (2007), and see *United States v. Carty*, – F.3d –, 2008 WL 763770 9th Cir. 3/24/08) (en banc) [Ninth Circuit will not even apply a presumption of reasonableness to a guideline sentence on appeal.]

Moreover, in order to justify or support a "variance" from the Guidelines sentence there is no requirement of "extraordinary" or "exceptional" circumstances. *Gall v. United States*, – U.S. –, 128 S.Ct. 586, 595-596, 169 L.Ed.2d 445 (2007). Finally, contrary to the assumption of numerous circuit court decisions, guidelines sentences are not a product of empirical data and not entitled to any assumption that they properly account for all of the statutory goals of sentencing. However, the district court must still determine what the guideline sentence would

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 6

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    be before determining what sentence to impose in the particular case. *Kimbrough v. United*

2    *States*, 128 S.Ct. 558 (2007).

3         The United States Supreme Court has, in *Kimbrough*, also had occasion to underscore

4    the punitive nature of home confinement and probation or supervised release, and to fully

5    approve it as an option following *Booker*, under the Section 3553(a) factors.

6         *Kimbrough v. United States*, *supra*, 128 S.Ct. 558, explicitly outlined how being

7    subjected to the rigors of supervision following conviction for crime is a substantial

8    punishment. Id., 128 S.Ct. at pp. 595-596. Similarly, in *United States v. Ruff*, 535 F.3d 999

9    (9th Cir. 2008) the Ninth Circuit upheld a sentence  of one day and home confinement and

10   noted that even probation is punitive and can drastically curtail the defendant's freedom, and

11   deter future crime.

12        Neither the statute (Section 3553(a)) nor *Booker* gives special weight to the guidelines,

13   and the statute clearly makes the guidelines subordinate to the primary mandate to impose a

14   sentence minimally sufficient to satisfy the purpose of sentencing.

15        The"statutory mandate to '<u>impose a sentence sufficient but not greater than necessary</u>'

16   to comply with the purposes of sentencing in section 3553(a)(2)" is paramount.

17        In *Kimbrough*, *supra*, the Supreme Court held that the mandate of Section 3553(a) that

18   <u>the district court shall impose a "sentence [which is] sufficient but not  greater than necessary,</u>

19   <u>to comply with the purposes set forth in the statute" is the "overarching" principle of federal</u>

20   <u>sentencing after *Booker*</u>.  See *Kimbrough*, 128 S.Ct. at 570:

21              "The statute, as modified by Booker, contains an overarching provision
             instructing district courts to 'impose a sentence sufficient, but not greater than
22           necessary' to accomplish the goals of sentencing, including 'to reflect the
             seriousness of the offense,''to promote respect for the law,' 'to provide just
23           punishment for the offense,' 'to afford adequate deterrence to criminal conduct,'
             and 'to protect the public from further crimes of the defendant.' 18 U.S.C. §
24           3553(a) (2000 ed. and Supp. V). * * * In sum, while the statute still requires a
             court to give respectful consideration to the Guidelines, see Gall v. United
25           States, ante, --- U.S., at ----, ----, 128 S.Ct. 586, at 594, 596, 2007 WL 4292116,
             Booker 'permits the court to tailor the sentence in light of other statutory
26           concerns as well,' 543 U.S., at 245-246, 125 S.Ct. 738.'"

27

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 7

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

By imposing a sentence of Probation and 18 days time served, on conditions designed to require Mr. Habermann to continue in his program of rehabilitation, with or without the rigors of home detention, the court would meet the goals of sentencing in this case. In addition, a fine and community service would re-enforce the fact that this offense cost the Government resources to investigate and would require Mr. Habermann to pay back his community.

**B.    Specific Factors That Justify a Variance in This Case**

Current Supreme Court nomenclature appears to favor the term "variance" when a District Court imposes a sentence pursuant to the factors it is required to consider under 18 U.S.C. § 3553. The Probation Officer's cover letter and PSR lists some of these factors, all of which are discussed below.

In this case, there are several bases on which this Court is urged to consider imposing a sentence below the advisory Guidelines sentence of 18-24 months found in the revised, final PSR.

Preliminarily, it should be noted that when the Government was responding to the draft PSR, in which the Guideline range was erroneously calculated as 24-30 months, the Government filed its sentencing memorandum recommending a below Guideline sentence of one year and one day. Please See Government's Sentencing Memorandum, p. 4, lns. 13-15. [". . . there is no sign that Habermann was actually planning to kill anybody"].

In addition, in the final PSR the United States Probation Department recommends a sentence well below the Guideline range of 6 months in custody - a sentence in the range of Guideline levels 1-8, in which the Guidelines themselves note that a defendant may be considered for a probationary sentence. In other words, all parties (the Government, the Defense and Probation) agree that this case is a good candidate for a sentence well below the advisory Guideline range. Presumably, the Government will revise downward its recommendation when it learns that the Guideline range is not 24-30 months, but is only 18-24 months.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 8

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    Finally, it should be noted that Mr. Habermann has already served 18 days in custody,

2    and nearly 8 months in home confinement.   Although home confinement as a condition of

3    Pretrial Release is not legally designed to punish a defendant, in this case the rigors of home

4    confinement has had aspects of punishment unrelated to the permissible statutory goals of

5    ensuring the defendant is not a flight risk, will appear when required and not a danger to any

6    person or the community.  Please see <u>Declaration of William J. Kopeny</u>, Exhibit 22 [Seattle

7    Pretrial considers the purpose of Pretrial home detention to be punishment]; <u>Michelle Miller</u>

8    <u>Letter</u>, Exhibit 11 ["punishment has been served by Charlie, having to wear an ankle locator

9    and being confined to home"]; and <u>Report of Dr. Leitman</u>, Exhibit 2. ["keeping him isolated

10   at home is punishing"].

11   Thus, for the reasons discussed in some more detail below, Defendant urges this Court

12   to impose a sentence of Probation, 18 days in custody time already served, continued

13   rehabilitation, a fine, community service and 6-12 months of additional confinement as home

14   detention.

15                                            **1.**

16                   **The Criminal Conduct in this Case (Even Though it Was**
                     **Carried out by Two Acts) Was Aberrant**

17

18   While the concept of an "aberration" may be neatly applied to a single act or event, the

19   law of sentencing under the Guidelines allowed courts to consider whether a person like

20   Defendant, who had never previously been convicted of any crime, should be a candidate for

21   a mitigated sentence because his involvement in a criminal course of conduct was aberrational.

22   Defendant submits that in this case, his involvement in the crime was indeed an aberration.

23   An "aberration" is defined as "the act of departing from the right, normal, or usual

24   course."[4]   Clearly, however, to be an aberration that qualifies for a lower sentence, a

25

26

27   [4]Random House Dictionary of the English Language (2d Ed. Unabridged) (1987).
     [First listed definition for "aberration."]

28

1  defendant's conduct must fit into the type of conduct that departs from the "normal or usual"

2  course (not merely conduct that departs from the "right" course).

3      When a person acts out of character, and when there is evidence of the cause of the out-

4  of-character action, the Court can impose a sentence with a higher degree of comfort that: (a)

5  the crime was not in the true nature of the individual; (b) now that the cause of the aberration,

6  (severe intoxication and alcohol addiction), is being treated, the likelihood of recidivism or any

7  future criminal conduct is also removed; (c) the person who has now been sober for many

8  months is fully remorseful and accepting of responsibility, because one who is normally law

9  abiding and good feels greater guilt and a greater desire to atone for his wrongdoing than one

10 who really does not care about being a good person; and (d) a lower sentence is morally

11 justified because while legally culpable, the aberrant nature of the conduct is a mitigating

12 factor which strongly justifies an exercise of mercy in the meting out of a sentence.

13     In this case the factors that came together to cause this conduct are discussed at length

14 in the many letters of those who have known Mr. Habermann for the longest and who have

15 known him the best, as well as the reports of his therapist, Dr. Michael C. Leitman.

16     This Court is, no doubt, familiar with the former case law under the Guidelines from

17 the Ninth Circuit that allowed a downward departure in this type of case for "aberrant

18 conduct" where the Court concludes that the conduct was: (a) out of character for the

19 Defendant; and (b) a course of conduct that was the result of pressures working on the

20 Defendant to do something he would not ordinarily do.  For example, in *United States v.*

21 *Working*, 224 F.3d 1093 (9th Cir. 2000) (en banc) [among the factors that justified a downward

22 departure were psychological disorder (depression); extreme pressure; aberrant nature of the

23 crime; motivation of the defendant was not greed.]

24     As is shown by the attached Exhibits, each of these factors is also present in this case.

25 Defendant was suffering from a psychological condition and alcoholism documented in Dr.

26 Leitman's report (Exhibit 2) and in the letters of his tutor and mentor of 18 years (Breiner

27 Letter, Exhibit 4) and of his friends and family (Exhibits 5-14).

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 10

1    Immediately upon being arrested Mr. Habermann took steps to deal with his

2    alcoholism, and his treatment, progress and ongoing rehabilitation is documented in Dr.

3    Leitman's report, and will be further addressed by his testimony at the sentencing hearing.

4        The availability of a downward departure, prior to *Booker*, where, as here, there is an

5    aberrational series of related criminal acts, was explicitly approved in *United States v. Lam*,

6    20 F.3d 999, 1003-1005 (9th Cir. 1994) [view that must be single event rejected]; *United States*

7    *v. Fairless*, 975 F.2d 664 (9th Cir. 1992) [departure in bank robbery case in light of depression,

8    first offense, loss of job, shock of family and friends]; *United States v. Morales,* 972 F.2d

9    1007, 1011 (9th Cir. 1993) [aberrant conduct departure allowed where no criminal history];

10   *United States v. Tokai*, 941 F.2d 738, 744 (9th Cir. 1991) [multiple acts over 6-week period,

11   involving bribing INS official to get green card, still constitute a single act of aberrant conduct

12   where defendant did not obtain pecuniary gain from crime]; *United States v. Dickey*, 924 F.2d

13   836 (9th Cir. 1991) [first offender bank theft based on $80K bank error]; *United States v.*

14   *Garcia*, 182 F.3d 1165, 1176 (10th Cir. 1999) [careful planning does not preclude first offender

15   from this departure, correct focus is not the aberrational character of the conduct, not on the

16   number of discrete acts undertaken by the defendant]; *United States v. Jones*, 158 F.3d 492

17   (10th Cir. 1998) [35 year old was law abiding until his marriage disintegrated].

18       Long before *Booker* and *Ameline*, the Ninth Circuit approved a substantial reduction

19   in the sentence for a bank robbery defendant who: (a) acted out of character; (b) was under

20   extreme stress; (c) acted from a combination of factors; (d) had recently lost his job; and (e)

21   was remorseful.  See *United States v. Fairless, supra,*  975 F.2d at 666.

22       Here, there are many more compelling factors, in addition to the convergence of

23   stressors and the aberrant nature of Mr. Habermann's conduct (as noted generally throughout

24   this Sentencing brief).

25       If this Court were to impose a Probation sentence, based on a combination of these

26   factors, on conditions that he continue to participate in rehabilitation, pay a substantial fine,

27   perform community service, and remain in home confinement for 6-12 months, together with

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 11

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1   the 18 days he has served already in jail, will meet but not exceed that sentence necessary to

2   serve all of the statutory goals of sentencing.  In another bank robbery case, where the District

3   Court sentenced the defendant to 50 months, the Circuit Court reversed because the District

4   Court did not address his arguments for a lower sentence, to wit: (a) that his mental illness,

5   schizoaffective disorder, warranted a lesser sentence under statutory sentencing factors; (b)

6   his mental illness reduced the need for deterrence; (c) made incapacitation by imprisonment

7   less appropriate; and (d) rendered him less deserving of punishment.  See *United States v.*

8   *Miranda*, 505 F.3d 785, 795 (7th Cir. 2007).

9           Here, Defendant urges this Court to conclude that the aberrant nature of Defendant's

10  conduct is a reasonable basis for imposing a sentence below the applicable Guideline range.

11  Moreover, contrary to the Government's claim that Mr. Habermann has engaged in similar

12  criminal conduct on other occasions, this threat against Congressman McDermott is

13  constitutionally distinguishable from Mr. Habermann's March, 2010 calls to a state legislator

14  and his call later on December 10, 2010 (the date of the offense in this case) to Congressman

15  DeFazio.  On both those occasions, Mr. Habermann made alcohol induced unsavory, mean and

16  unforgivable calls to other elected officials with whom he disagreed politically, but in both of

17  those cases he explicitly disavowed any intention to actually hurt anyone and made it clear that

18  he was merely blowing off steam because of his opinion of the person he called.[5]  The recent

19  Ninth Circuit decision in *United States v. Bagdasarian*, — F.3d —, 2011 WL 2803583 (C.A.

20  9 (Cal.). [Filed 7/19/11] makes it very clear that such statements to elected officials, where the

21  surrounding circumstances make it clear that the subjective intent of the speaker is not to truly

22  threaten the official but rather to express, even in anti-social terms, his or her disagreement

23  with or dislike of the official, such speech is absolutely protected under the First Amendment.

24

25

26

27          [5] Please see the Defendant's Objections to the draft PSR, attached by the Probation

28  Officer to the Final Draft of her Presentencing Investigation Report.

1    It is the threat to Congressman McDermott alone that crossed that line from "pure

2  speech" to a "true threat" in the parlance of First Amendment jurisprudence, and that is the

3  aspect of the charged threats that make them criminal, and that make them an aberration.

4    Lest the Government would advocate that this Court punish Mr. Habermann based on

5  protected speech involved in the unrelated calls to the state official, or the call later in the

6  morning of December 10, 2010 to Congressman DeFazio, in which Mr. Habermann made it

7  very clear he had no intention of actually hurting anyone, this Court is urged to: (a) view his

8  threatening calls (at 12:00 midnight, and at 12:10 am) as an aberration, out of character for

9  him, even in his highly intoxicated state.

10                                         **2.**

11                **A Non-Custody Sentence Would Allow the Defendant**
                   **Continued   Access   to   Counseling,   Treatment   and**
12                **Rehabilitation**

13    One of the purposes of sentencing is "to provide the defendant with needed education

14  or vocational training, medical care, or other correctional treatment in the most effective

15  manner." 18 U.S.C. § 3553(a)(2)(D); *United States v. Martin*, 826 F.Supp. 232 (S.D.N.Y.

16  1993).

17    Even under the mandatory Guidelines, various courts had found that it was permissible

18  to depart from the otherwise mandatory guideline sentence to a grant of probation when a

19  custody sentence would interfere with a future or present ongoing program of treatment or

20  counseling that addressed the causes or effects of the Defendant's criminal conduct. See e.g.,

21  *United States v. Jones*, *supra*, 158 F.3d 492, which held it was permissible to depart down to

22  probation when imprisonment would sever the defendant's access to rehabilitative counseling

23  given the above purpose of sentencing.

24    In *Jones*, the defendant had been convicted of a firearm offense and the district court

25  found that his actions were aberrant and that he would benefit from counseling related to the

26  psychological circumstances that led to his offense. In upholding the district court's departure

27

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 13

down to probation, in part so that the defendant could continue to benefit from counseling available to him at his place of employment, the Circuit Court stated:

> "In describing Mr. Jones' post-offense conduct, the district court specifically noted Mr. Jones had 'scrupulously followed the conditions of release,' including refraining from contact with Ms. Begay, his estranged wife. Mr. Jones had 'worked regularly,' supported his three children, and had daily contact and regular consultations with a psychologist, resulting in a 'significant improvement in [Mr. Jones'] understanding and attitude.' The district court found Mr. Jones had changed both his 'attitude and conduct' during his post-arrest release. In deciding to depart downward, the sentencing court concluded Mr. Jones' post-arrest improvement was 'significant.'

> * * *

> "The . . . ground for departure supplied by the district court was the <u>negative effect incarceration would have on both the quality and quantity of Mr. Jones' rehabilitative counseling</u>. The Government contends a defendant's mental and emotional conditions are not ordinarily relevant to sentencing, and that there was 'nothing life-threatening or otherwise exceptional about the deprivation' of counseling services in Mr. Jones' case." *United States v. Jones*, *supra*, 158 F.3d at 503.

The Court there relied on precisely the type of consideration which the Supreme Court in *Booker* held district courts <u>must</u> consider in the wake of its determination that the Guidelines are no longer mandatory.

> ". . . One of the purposes of sentencing is 'to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.' 18 U.S.C. § 3553(a)(2)(D)." *Id.*, at 503.

As noted above, the Supreme Court held in *Booker* that sentencing courts exercising discretion as to whether to sentence below the advisory Guideline range must now consider the factors set out in Section 3553(a).

The Court in *Jones* concluded:

> "Under these circumstances, we conclude the district court did not abuse its discretion when it considered access to rehabilitative counseling as one factor supporting its decision to depart downward." *Id.*, at 503-504.

Even under the Guidelines, there was a recognition that an infirm defendant might benefit from home confinement in place of incarceration under certain circumstances. Cf., U.S.S.G. § §5H1.1 [Age may be considered, for example, when a defendant is "elderly and infirm and where a form of punishment such as home confinement might be equally efficient

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 14

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    as and less costly than incarceration."] §5H1.1 (citing *Koon v. United States*, *supra*, 518 U.S.

2    81, 116 S.Ct. 2035, 135 L.Ed.2d 392.)

3          Moreover, the Guidelines themselves recognized that mental and emotional conditions

4    are specific offender characteristics (U.S.S.G. § § § § 5H1.3) and under *Booker* such specific

5    offender characteristics must be considered in the district court's exercise of discretion in

6    sentencing.

7          The Ninth Circuit had also recognized that promoting post-conviction rehabilitation

8    was a valid reason for a mitigated sentence even prior to *Booker.*  Thus, in *United States v.*

9    *Sanchez Rodriguez* 161 F.3d 556 (9th Cir. 1998) (en banc), the Ninth Circuit overruled several

10   prior Ninth Circuit cases forbidding departure on particular grounds, including post-offense

11   rehabilitation, on the basis of *Koon v. United States*, *supra*, 518 U.S. 81, 98-100, 116 S.Ct.

12   2035, 135 L.Ed.2d 392.  Citing 18 U.S.C. §3553(a) for the proposition that "imprisonment is

13   not an effective way to promote . . . rehabilitation..." and citing *Application Note 6 to*

14   *Commentary to* U.S.S.G. § 5C1.1(d)(2) for the proposition that rehabilitation is a basis for

15   departing from custody to home confinement in case of a split sentence, the decision in

16   *Sanchez-Rodriguez* was a precursor to post-*Booker* sentencing that focused on precisely the

17   factors that the Court now <u>must</u> consider in exercising its discretion to impose a just sentence.

18          The Probation Report correctly identifies the fact that alcohol abuse was a major factor

19   in the commission of this crime and that it mitigates the defendant's culpability because he has

20   an addiction to alcohol.   Under the above authorities, where, as here: (a) the crime does not

21   result in any physical harm to the victim or anyone associated with him; (b) the offense is the

22   result of extreme intoxication; (c) the defendant has embarked on a 7-month program of

23   abstinence from alcohol and is making significant progress in his rehabilitation; and (d) the

24   defendant recognizes his problem and has expressed his remorse to the Court and apologized

25   to those who were harmed (emotionally) by his crime, Probation and continued rehabilitation

26   is appropriate.

27

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 15

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    Moreover, both the non-expert friends, family members and former professors and

2    tutors who know Mr. Habermann, as well as his expert therapist, agree that: (a) Mr.

3    Habermann is not and never has been dangerous; (b) he is a kind and giving and generous

4    person; (c) he has, for the first time in his life, finally admitted that he cannot and will not ever

5    drink alcohol again; (d) he will succeed in his program of rehabilitation so long as it is

6    permitted to continue; and (e) he was very fearful of and is highly motivated never to return

7    to custody.  This case is a classic example of the type of case the above authorities were

8    referring to in recommending probation and rehabilitation in lieu of further custody time.

9    For example, Jason Ortiz is a close friend from college, and a liberal writes that he was

10   poor and on scholarships at DePaul University when he and Charlie met, but lauds his

11   conservative friend for his kindness, generosity, thoughtfulness and loyalty as a friend.  He

12   was always there to help Mr. Ortiz buy food and other necessities and he was impressed that

13   Charles could help with his grief when his father passed away.  Like the others, Mr. Ortiz

14   asserts that Mr. Habermann never could be violent.  He asks the Court to balance the

15   Defendant's "14 years of good deeds" against his crime and asks the Court to "show mercy"

16   on him at sentencing.  Exhibit 10, <u>Letter of Jason Ortiz</u>.

17   Michelle Miller describes the Defendant as a "kind, sweet caring young man who is

18   genuinely concerned for the welfare of the people."  She knows about the charges but

19   observes, "anyone who drinks, has at one time or another said or done something stupid that

20   they live to regret."  She thinks "punishment has been served by Charlie, having to wear an

21   ankle bracelet locator and being confined to his home."  She concludes:

22       "For Charles Habermann's life, continuing counseling and substance abuse

23       therapy would be in his best interest.  NOT JAIL TIME. I have even suggested

24       to Charlie to go volunteer at a college and speak, as he is very knowledgeable

25       and would be an asset to the continuing success of the U.S.A."  Exhibit 11,

26       <u>Letter of Michele Miller</u>.

27

28

1    Nicole McCurdy concurs with the others who know Mr. Habermann that his only

2   genuine problem is alcohol, that he is not a violent person.  She adds, "I do not believe that

3   jail is the right way in which to help him. . . . continuing on with therapy is a more helpful

4   way to deal with his issues."  Ms. McCurdy also confirms he is an honest person.  Exhibit 12,

5   Letter of Nicole McCurdy.

6    Bradley Aylward a long time friend assures the Court that he would not write for Mr.

7   Habermann unless he were honestly convinced he is not a dangerous person.

8    Mr. Aylward states that the problem the Defendant has had in the past is that he "gets

9   very intoxicated and can get very angry or start to dwell on something bad that is happening

10  in his life."  Exhibit 13, Letter of Bradley Aylward.  He has never seen Defendant dangerous

11  to anyone and he is a "long time Christian" and he believes in the truth.  He states:

12

13      "If I thought Charles was a threat to society or anyone, I would never write this
        letter. * * * If I felt Charlie were a threat, I would not want him in society. * *
14      * I feel Charlie would most benefit from alcohol treatment and possibly anger
        management therapy.  Once again, I think this situation would have never
        happened had Charlie not been drunk.  Putting Charles in prison won't give him
15      the coping skills to stay sober and teach him the tools to cope with his anger
        issues.  I hope this situation will teach Charles a valuable lesson, but also give
16      him the help he needs to turn his life around."  Id., p. 1.

17     Finally, Brian Mr. Gabrysiak testifies to Mr. Habermann's generous and kind nature.

18  The two met in school (DePaul University).   He reveals that when the Defendant learned

19  about the financial struggles his family was having and the fact that his brother was suffering

20  from autism, he was taken aback at Mr. Habermann's "offer to help us financially with any

21  costs related to medications and treatment." He was "moved and very emotional that he would

22  do this for [him], his friend." Exhibit 14, Letter of Brian Gabrysiak, p. 1.

23                          Dr. Leitman's Report

24     Within days of being arrested, Mr. Habermann began seeing Dr. Michael Leitman, a

25  qualified psychologist.   See Exhibit 1, C.V. of Dr. Michael Leitman.

26     Mr. Habermann has been diagnosed as suffering from "Addictive Personality Disorder"

27  and a very high level of anxiety.  Exhibit 2, Leitman Report, p. 3.

28

In his Report Dr. Leitman states:

> "Mr. Habermann does not pose a threat to anyone. * * * He has made progress in therapy. Mr. Habermann has begun to recognize some of the underlying problems which contribute to substance abuse. *** [He] . . . has demonstrated a growing understanding of the negative changes in his personality when he uses alcohol. * * * Mr. Habermann wants to change and become a more effective human being." Exhibit 2, p. 7.

In order to continue his therapy and rehabilitation, Dr. Leitman recommends:

1.    Insight oriented psychotherapy.

2.    Medication prescribed by a physician to help quell his anxiety.

3.    Techniques of a 12-step program will be applied. These include . . . making amends to people he has inadvertently hurt while under the influence of a substance.

4.    Mr. Habermann should remain in treatment for at least 12 months following [sentencing] and a condition of probation.

Dr. Leitman also reports that Mr. Habermann has made progress in therapy. Specifically, he reports:

1.    Mr, Habermann has made "great strides" in his treatment.

2.    He is beginning to understand the sources of his anxiety and recognizing that he can live without chemical assistance.

3.    He is "looking as his parents with an adult consciousness. He "no longer has to react to them as if he were a child." He "can see that they did the best they could in raising him" and is "able to accept his parents" and "forgive them for the mistakes they have made in raising him."

4.    He is "recognizing mistakes he made in friendships before using substances."

5.    He understands the advantages he has had in life which "has enabled him to be less judgmental of other people's failures.

In order to continue this progress in his rehabilitation, Dr. Leitman recommends further:

1.    He write letters of apology for what Mr. Habermann can see is the pain he has caused others.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 18

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

2.    Improve his self-esteem.

3.    Continue exploring the external causes for his anxiety.

4.    Recognize that others are, for the most part, doing the best they can.

His final recommendations are that Mr. Habermann:

1.    Remain in treatment for 12 months.

2.    Remain free of illegal substances and alcohol.

3.    Required to do community service (at, e.g., the Mizel Senior Center in Palm Springs, helping retired people who are struggling to manage their assets.

Dr. Leitman has considered alternative therapies, such as the Betty Ford Center, but explains why those programs would be less beneficial in Mr. Habermann's rehabilitation than continuing him in his one-on-one therapy with Dr. Leitman.  That explanation includes Dr. Leitman's expert opinion that: (1) Dr. Leitman and Mr. Habermann have already "established a therapeutic alliance" which is "essential for progress"; (2) in a group setting Mr. Habermann's shyness would impair his ability to establish new group relationships; (3) Dr. Leitman has made himself available for crises, if needed; (4) Putting Mr. Habermann in a group setting would expose him to stories of when he and others were "wasted" which would be counterproductive; (5) the threat of going (back) to jail has helped <u>cement</u> Mr. Habermann's abstinence from alcohol and "he regrets the way he has treated others and will [already] be "writing letters to people he has hurt while drinking (verbal abuse, not physical) so that he can make amends"; (6) He would, if placed in custody or a group program "lose the connection" he and Dr. Leitman have "developed. . . because it is not advisable for a person to have more than one therapist at one time."  Exhibit 2, <u>Report of Dr. Leitman</u>.

Dr. Leitman has also addressed the effect and impact of home confinement on Mr. Habermann this past seven months since his arrest in early January, 2011.  He explains that "if he went to prison he would not be able to continue the gains he has made."  Moreover, he notes that "keeping him isolated [in home confinement] is punishing."  *Id*., at p. 7.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 19

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    This expert opinion (that home confinement is punishing) is a legally sound

2  observation.   It has been endorsed by both the United States Supreme Court and the Ninth

3  Circuit Court of Appeals.  See *Kimbrough v. United States*, *supra*, and *United States v. Ruff*,

4  *supra*.

5    Indeed those who have addressed this court by letter and Dr. Leitman all agree on these

6  points.  For example, Dr. Elwood Cohen writes that he has known Mr. Habermann "for years"

7  and that throughout this time he has found him to be a "very kind and conscientious young

8  man who has put concern for others above himself."   Although he is familiar with what he

9  terms Mr. Habermann's "indiscretion and idle threats" he is "confirmed that [Mr. Habermann]

10  is really not capable of administering harm to anyone whatsoever."

11    Dr. Elwood also confirms that over many hours of consultation, he <u>knows</u> that Mr.

12  Habermann "is indeed very sorry for his action."

13    Martin H. Breiner was Mr. Habermann's tutor but clearly is now a confidant and

14  mentor.   Breiner is a graduate of Harvard University and a former New York City Police

15  Officer.   He won numerous scholarships in high school, but ultimately accepted a full

16  academic scholarship to Harvard.  Following that, he won a Woodrow Wilson Fellowship to

17  study at Columbia University and then to study law in Chicago, Ill. at the University of

18  Chicago Law School, also on a full scholarship.   After he graduated, he held several jobs,

19  including New York State Unemployment Insurance Claims Adjuster and (for four years)

20  New York City Police Officer.

21    Mr. Breiner has also worked as a tutor, and he met the Defendant in this case over 18

22  years ago in that capacity.  He believes he is the best judge of Mr. Habermann's character

23  because of his unique abilities and his longstanding relationship with him.

24    Mr. Breiner reports that "Charles' passion for the stock market is the only really strong

25  and ongoing effort he has pursued and continues to pursue."  He is "one of the most

26  knowledgeable and logically thinking individual[s]" Breiner has met.

27

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 20

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    Mr. Breiner has "never" used drugs or alcohol.  He is the only person he knows that

2    is Charles' friend that does not or never has engaged in substance abuse.  He has cautioned

3    Mr. Habermann to seek a therapy program in the past, but "he seemed to feel he had to

4    continue to indulge in his addictive behavior because of the frustration he felt with his

5    immediate family."

6    Mr. Breiner opines that the Defendant's father has a substance abuse problem (alcohol)

7    and despite his love for his father, the elder Mr. Habermann is too "stolid, insensitive, and

8    emotionally detached from his son to respond . . . ."  He has never given Charles "praise for

9    the successes he has had in the past three years in following his own muse through the mine

10   territory of the ever changing stock market."

11   "His father's pathetic attempts to handle anything other than alcohol and the
     day-to-day weather in Chicago was underscored when he was visiting Charles

12   in Palm Springs the day Charles was arrested.  In his typical insensitive and
     detached response to this situation, he informed Charles that he could not stay

13   to help him with the problems of arrest and bail conditions because he had paid
     for a train ticket back to Chicago and did not want to alter his plans."

14

15   Similarly, according to Breiner, the Defendant's mother has been "too caught up with

16   her social clubs and society friends to provide Charles with the honest interest and respect for

17   his talents that he has been desperately searching for."

18   His sister, Whitney, "has always resented Charles since he was born, because his

19   appearance deprived her of being a pampered and over-indulged only child."

20   He continues, "Charles seeks love and approbation from his two parents and sister, but

21   never succeeds in this effort.  He is basically starved for approval and praise, and his inability

22   to obtain this has often left him frustrated and depressed."

23   Stating that he has been around people who *are* capable of violence in his job as a New

24   York Policeman, Breiner states about Charles, "No matter how aggressive he may have

25   sounded or how much he may have voiced a false bravado, I knew he was incapable of doing

26   anything more than allowing his bark to be worse than his bite."

27

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 21

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

Like every other person who knows Charles and has addressed this Court, Mr. Breiner confirms that he "know[s] Charles has virtually ended his cocaine addiction in 2009 when he moved from his high school 'friends' . . . " and states:

> "I am glad that Charles has been forced to undergo serious treatment for his addition problems, so that the life of this very bright and intelligent human being can be saved. . . . [h]e is making great strides in moving away from his two addictions – heavy drugs and alcohol. I feel that Charles will now continue with his recovery program, and with the assistance of the professional help he is now receiving, he will be able to become a sober and less tormented member of . . .society..."

This very smart, former police officer also states that "it would be a great mistake to incarcerate Charles at this time, since he is an individual, who with the behavior modification he is undergoing through his present psychologist, can contribute much more to the community by sharing his knowledge about generating money from the stock market with those retired seniors he lives among in his present [Palm Springs] residence." He repeats his confidence Charles will "continue to make progress" but that "incarceration will have a deleterious and counterproductive effect on the success of this program."

Mr. Breiner also confirms that the 18 days Mr. Habermann spent in jail, pending a hearing on his violation of a condition of his pretrial release, "had a major impact on him, and brought home to him the strong realization that such impulsive and immature actions can have serious consequences." He is confident that the Defendant is "now cognizant of how important it is to follow the rules of society, and that he is willing to avoid returning to jail by obeying all rules of any Court ordered program."

On the subject of the reason for Mr. Habermann's actions in threatening the victim and his family, Mr. Breiner writes:

> "I know that he really never intended to carry out his telephone threats to the Congressman, but had had a frustrating conversation with his non-responsive father and insensitive sister prior to those telephone calls, and as a psychologist would state, he was displacing anger on someone who he inwardly knew he would never meet or interact with. His behavior at that time is not to be condoned or justified, but I feel that his present recovery program will prevent him from engaging in such behavior in the future."

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 22

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

Just as the Government concedes, Professor Kelly, the Defendant's college academic advisor, expresses the view that she "cannot imagine him becoming physically violent with anyone, nor have I ever seen any indication of a propensity to violence in him."  She also confirms that Mr. Habermann quit using cocaine "virtually without any assistance" in late 2009, and that he has been alcohol free for going on 8 months (since his release on pretrial supervision in this case).

On the effect of the 18 days Mr. Habermann has spent in custody on this case, Dr. Kelly describes this as a "blessing in disguise" because they "finally made him see that actions – especially where reckless disregard for rules is concerned – have serious consequences." He has "passed a major turning point in his life . . . he now seems to do whatever it takes to avoid being returned to jail."  Finally, Dr. Kelly concludes that both Charles and society would benefit from his continuing therapy, rather than locking him up.

**3.**

**<u>Youthful Lack of Guidance</u>**

A disadvantaged upbringing can render a first time offender sympathetic, and often is invoked as a reason to have mercy or compassion when sentencing.[6]  Under the federal model, the concept of a "youthful lack of guidance" is often the way the suffering of a disadvantaged youth is distilled into a rational basis for a finding that it is actually mitigating when considering the Defendant's history.  *Ameline*, *supra*, 409 F.3d at 1092.

Once the Supreme Court decided *Koon v. United States*, *supra*, the continued validity of any <u>prohibited</u> departure basis (other than gender, race, religion or wealth) was in serious doubt, and following *Ameline* and *Booker* such prohibitions in the Guidelines were clearly unconstitutional.   The rationale underlying the approval of "youthful lack of guidance" as a basis for a downward departure also serves to explain why it is a mitigating aspect of this Defendant's personal history and character, and thus a proper basis for considering a sentence

---

[6]  "The quality of mercy is not strained."  William Shakespeare, <u>Merchant of Venice</u>, Act IV, Scene 1 (Portia's soliloquy).

**DEFENDANT'S SENTENCING MEMORANDUM**
(***United States v. Charles Turner Habermann***, Case No. CR11-29JLR) - 23

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

below the Guideline range under 18 U.S.C. § 3553(a).  See *United States* v. *Floyd*, 942 F.2d 1096 (9th Cir. 1991) (affirming a departure based on defendant's 'youthful lack of guidance')

In the present case, the PSR and various attached letters document facts that rendered Mr. Habermann's situation appropriate for a "youthful lack of guidance" variance. Specifically:

1. When his parents were still married, his father was either sober, in which case he was exceptionally intolerant of a boy who was not perfectly neat, tidy and organized, but when he was intoxicated (which was most of the time), his father was either happy and totally unengaged, or passed out.  See PSR, p. 12, ¶52.

2. The parents split when Charles was 8 years old and Mrs. Habermann began to attempt to relive her single days, finding new, younger friends and lovers.  She was clearly wrapped up in herself, so much that although she and her two children, Charles and Whitney, lived in a luxury apartment she owned on Lake Shore Drive in Chicago, she bought another luxury apartment on 5th Avenue in New York City, and spent much of her time there once Charles was in high school.  At that time Whitney, his older sister, was off to college, leaving Charles alone in a 3700 square foot home.   When asked by the Probation Officer if there was anyone there to watch him he replied that his mother telephoned him almost daily and that the building "had a doorman." *Id*., ¶51.

3. Left pretty much on his own for these years, Charles would carouse with friends who routinely used drugs and drank alcohol without any supervision.   He was given money, but no real instruction on how to act or rules to follow.

4. When Charles was suspended from a private high school for using marijuana, the family simply found him another place to go to school, but did not get him any help.

5. When he had a car accident while intoxicated his mother found an attorney to handle the matter but did not address his drinking.

6.    It was not until Charles was in his early thirties, around the time that three of his drug using friends died of drug related causes (see Exhibit 4, <u>Breiner Letter</u>), that Charles, on his own, made arrangements to check himself into a Palm Springs rehab center to address his cocaine use. When he arrived he was told he would be given a medication but the center refused to identify it, or its side effects and Charles left rehab the next day. Nevertheless, Charles had been determined to quit using hard drugs (cocaine) because he feared for his own life, and <u>he has never used them again</u>.

7.    No parental figure ever counseled the defendant about the need to follow rules or to avoid the abuse of drugs and/or alcohol. He was beginning to figure out some of this in 2009 when he moved to Palm Springs and quit cocaine, but he was suffering from a serious anxiety disorder and he was medicating it with medical marijuana (legal in California) and occasionally drinking alcohol. Even by the age of 31 Mr. Habermann still lacked enough basic understanding that he was no different than other people, that he must follow rules of society and that he must not use drugs or alcohol because they are destructive to him and could make him dangerous to others.   The reason he did not run afoul of the law earlier is because he is a basically nice person. See Exhibits 5, 10, 11, 13 & 14.

8.    While unusual, there is no difference between a person who was poor and lacked youthful guidance, and Mr. Habermann who, while rich, was utterly without any parental guidance in his formative years.   His mother now admits that his underlying problem is anger from the time of the divorce, and that she was pursuing her new friends instead of dealing with her son's issues. See Exhibit 6, <u>Margie Habermann Letter</u>. He suffers from emotional abandonment by his father and mother, and neither served him well. Neither gave him the basic tools for living as a mature adult in society. See Exhibit 4. He is learning about that now.   When he broke a rule of Pretrial Supervision he was

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

incarcerated twice (for that same infraction) for a total of 16 days. In her letter

Mrs. Habermann writes: that she has been a part of the problem that led him to

this Courtroom.

"[T]he root of Charlie's anger lies in the past and has nothing to do with politics. It has to do with the unresolved anger with his mother. When I divorced his father it was my decision and responsibility and I made that clear to the children. I believe he was terribly saddened and perhaps even angry at this time. Later, though I kept my friendships with my previous group of friends, of whom there were many, I began seeing new people, much younger friends and to date younger men. This formed a new part of my life and one that I believe Charlie resented and was very angry and disappointed with."

She nevertheless recognizes that the Defendant is now, finally, making progress

in his current program of therapy and rehabilitation:

"Perhaps now he is finally making progress with these issues. * * * I do indeed believe Charlie can stop drinking, . . . Using the help of professionals, including the current therapist, and any other program he believes would benefit Charlie, I think he can rebuild his life. He is much stronger than I thought he was."
                                              * * *
"Charlie was terrified spending time in jail, being there again would only delay his getting the help he so obviously needs. He has made tremendous progress with Dr. Leitman and if that were curtailed it would be most unfortunate. * * * He knows now that you do not break rules, that those consequences are enormous and sure to be enacted. I have every confidence that Charlie would be compliant with any court ordered program and would adhere to all rules and regulations connected with it."

9.    That violation was not only minor, considering the purpose of pretrial

supervision, it was a ridiculous action by the Defendant. Mr. Habermann, in

his high state of anxiety, was mulling over his plea agreement and the fact that

he was facing possible jail time for his stupid, drunken phone calls. It was a

Sunday and he started looking around his apartment. He realized that he had

misplaced his car keys and he began to obsess about finding them. He

telephoned counsel at least three times that evening, to discuss the fact that he

was frustrated about not finding his keys. Finally, he found them and felt a

normal desire to just get out of the house (apartment) for a short drive. He

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

called his Pretrial Supervision Officer, who, of course, was not at the number he called because it was a Sunday evening. He left a message saying words to the effect, "I know it's not allowed, you can put me in jail if you have to, but I am upset and I'm going to take a 20-minute drive." He did take a drive, and due to his high anxiety when making a u-turn to go back home, he collided with a tree and the police arrived. He was tested and found not to be under the influence, and because his car was damaged he was driven home. He called counsel, who telephoned Pretrial the following (Monday) morning, and advised that Charles had been in a one car accident, he had taken prescribed Xanax (which does not affect driving), and the police came to the scene, he was not under the influence of anything and he was taken home because his car was damaged. See Exhibit 22, <u>Declaration of William J. Kopeny</u>; Exhibit 23, <u>Partial Reporter's Transcript of Hearing in Central District</u> regarding this incident.

10.    Mr. Habermann appeared in the Court of the United States Magistrate Judge in the Central District of California and after a hearing in which his supervising Pretrial Officer, Brenda Orantes, weighed in, he was re-released on the same conditions of release – home confinement and location monitoring. Ms. Orantes confirmed that Mr. Habermann was not driving in the direction of Seattle, and that he merely drove down a main road in Palm Springs away from any freeway and turned around and headed for home. She did not think he was a flight risk or danger. Mr. Habermann was ordered to appear in Seattle to set a hearing date on the violation before the Magistrate Judge who released him on Pretrial Supervision in the Western District of Washington. He did appear, but because that Magistrate Judge was not available, another bench officer who had no knowledge of the case set the hearing date and (unexpectedly) detained him pending that hearing. When United States Magistrate Judge Donohue heard the matter, he also re-released Mr. Habermann on the same conditions of pretrial

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 27

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

release.  On both occasions, Mr. Habermann addressed the courts and assured them that he now realized that <u>any violation</u> of any rules set down by the Court or Pretrial was serious.  See Exhibit 23, pp. 13-14.  He understood that it is not just attempting to flee or causing harm or danger that is serious, but that it is crucial that he follow each and every rule.   This was something new for Mr. Habermann, and serving a total of 18 days in custody was extremely stressful because of his anxiety disorder, and he was fearful the entire time.  He has convincingly revealed to his therapist, his family, his counsel and his most trusted friends that he wants never to return to jail (or "prison" as he calls it) and that he will faithfully obey each and every rule required of him.

11.    For any ordinary 33 year old, this would be laughable.  Of course, he should know to follow rules of the Court that releases him.  But for Mr. Habermann, being required to obey rules has been a relatively new experience, and all who know him attest to the fact that he has now taken seriously the conditions of his release, the rules of Pretrial and any orders of the Court.

12.    The Government suggests that Mr. Habermann has engaged in a pattern of ignoring warnings.   They argue that in March 2010 he called and threatened a state elected official while drunk and the California State police interviewed him, determined he was no danger and gave him a warning not to threaten officials.    Then in December of 2010 he not only called Congressman McDermott's office and left him the threatening calls constituting this offense, he also called another Congressman and left a threatening call.  *Then*, the Government argues, Mr. Habermann was given yet another warning by this Court, not to disobey any rules of Pretrial or Court orders and yet he totally disregarded even that warning, and he violated the rules of Pretrial Release.  We observe that: (a) Mr. Habermann's violation of the pretrial rule not to leave his home without advance approval of his supervising officer is nothing like getting

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 28

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

drunk and making a threatening call to an official; (b) Mr. Habermann did break that rule, but he: (i) called first and advised his Supervision Officer he was going to take a short drive; (ii) he was not taking or drinking any intoxicating substance, and he has not had any alcohol or marijuana or any non-prescription drug since his release on pretrial supervision; (iii) Mr. Habermann *did* what he told his officer he was going to do, take a short drive; (iv) Mr. Habermann did not realize that violating even this rule could land him in jail. The experience of being jailed, twice, for this single act, has brought home to Mr. Habermann that he is not allowed to make his own rules or to do whatever seems reasonable to him – rather he must follow rules and Court orders no matter what. He now realizes that there are reasons for these rules, but regardless of whether he understands those reasons, his obligation is to obey them. His therapist states that being jailed has strengthened Mr. Habermann's resolve to never drink again (Exhibit 2) and his other close friends and family echo this view. Mr. Habermann himself expressed his understanding and total supplication to the authority of the Court and probation in his letters to this Court. See Exhibit 23, <u>Partial Transcript of 5/27/11 Detention Hearing</u>, pp. 13-14.

For these reasons, this Court is urged to consider that Mr. Habermann's crime is in part the result of "youthful lack of guidance" recognized by federal sentencing law as a good basis for a sentence below the Guideline range and in this case, because Mr. Habermann has already been through the experience of breaking a Pretrial rule and paying the consequences by being jailed twice for that error, this Court can have confidence that he understands that any conditions of his release on Probation are absolute and that there is a zero tolerance of violations. This experience makes him more amenable to treatment and continued rehabilitation, and if the Court sends him back to jail now, it will send the message that even following all the rules is not good enough.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 29

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    This case fits well into those situations recognized by pre-*Booker* case law as qualifying

2    for a mitigated sentence based on "youthful lack of guidance."

3    In *United States* v. *B. Roe*, 976 F.2d 1216, 1218 (9th Cir. 1992), the district court

4    erroneously believed the facts of the case did not permit a downward departure.  A panel of

5    the Ninth Circuit reversed and remanded to the district court "to exercise its discretion in

6    determining whether the exceptional nature of Roe's history of abuse warrants a departure .

7    . ." (*Id.*, at 1218)   Of course, after *Gall v. United States*, *supra*, the defendant's history of

8    abuse need not be "exceptional" to justify a <u>variance</u> from the Guidelines sentence. 128 S.Ct.

9    at 595-596.

10    After concluding the case must be remanded, the Court in *B. Roe*, *supra*, went on to

11    point out that the district court would be permitted to consider a "youthful lack of guidance"

12    departure under *United States* v. *Floyd*, *supra*, even though that theory was, apparently, not

13    advanced in the district court originally.

14    "On remand, the district court may also wish to consider whether Roe's
history of abuse and neglect warrants a departure under our recent decision in
*United States* v. *Floyd*, 942 F.2d 1096 (9th Cir. 1991) (affirming a departure

15    based on defendant's 'youthful lack of guidance').  Roe lacked any semblance
of a stable family environment, and it is doubtful she received any meaningful

16    guidance from her drug-addicted mother or her mother's abusive boyfriend." *Id.*

17

18    The Court there also emphasized, that a departure may also be justified by a

19    "combination of circumstances."

20    Under *United States v. Floyd*, *supra*, 945 F.2d 1096, 1100 a District Court is entitled

21    to conclude that a reduced sentence is appropriate, where as here, that lack of guidance and

22    education "may have led a convicted defendant to criminality." *Id.* at 1101. While the

23    Sentencing Commission later decided that youthful lack of guidance was not relevant to

24    sentencing departures, U.S.S.G. §  § 5H1.12, this prohibition was specifically mentioned in

25    *Ameline* as being unconstitutional and is once again a valid basis for a below-Guideline

26    sentence, under 18 U.S.C. §3553(a), because it is clearly a significant and mitigating aspect

27    of the Defendant's personal history and character.

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 30

1    This Court can consider Defendant's family situation in determining if a sentence below

2    the guideline range is justified. *Ameline*, *supra*, 409 F.3d at 1092. Here his "family situation"

3    conflates with the "youthful lack of guidance" factor.

4    Mr. Habermann's family situation is addressed in the attached exhibits. In particular,

5    four exhibits are relevant to this issue, as is the Probation Report. See Exhibits 2, 4, 6, and 7.

6    The Probation Officer endorses this as a justification for a below Guidelines sentence.

7    In the Cover Letter to the PSR, the Probation "Sentencing Recommendation" states:

8
9    "[T]he defendant described growing up in an extremely dysfunctional family.
He was privileged, but his parents divorced when he was just eight years old.
Thereafter, his mother was often absent and his father was a high-functioning
10    alcoholic. His father was also very involved and knowledgeable about financial
matters, and Habermann attempted to use their mutual interest in this area as an
11    avenue for acceptance; however his attempts were often rebuffed. . . . [H]is
father was critical, emotionally neglectful, and dismissive." *Id*., PSI Sentencing
12    Recommendation, p. 3.

13    Mr. Habermann's father's relationship with his son is of predominant significance in

14    terms of his "family situation" and its relationship to sentencing. See Exhibit 2, Report of Dr.

15    Leitman, and see Exhibit 7, Letter of Robert Habermann (Defendant's father). It speak

16    volumes.

17    A difficult family situation is a valid basis for a sentence substantially below the

18    Guideline range in particular cases.

19    In *United States v. Menyweather*, 431 F.3d 692 (9th Cir. 2005), the Ninth Circuit upheld

20    a substantial downward departure, and ultimately a sentence below the Guideline range under

21    Section 3553(a) based on the Defendant's family difficulties.

22    In *United States v. Menyweather*, *supra*, the Ninth Circuit upheld a probation sentence

23    which was 8 levels below the applicable Guideline range. The facts of *Menyweather* that

24    supported a higher sentence included her three year program of theft from the United States

25    Government while an employee of the United States Attorneys office, her fraudulent use of

26    Government and other credit cards, loss in the amount of at least $435,000, and a series of acts

27
28

to cover up her theft and avoid detection.[7]  Despite these facts, the Ninth Circuit upheld the

probation sentence imposed under *Booker*.

> "Before *Booker*, we reviewed de novo whether a departure was proper under the constraints set forth in the United States Sentencing Guidelines ('U.S.S.G. § § § §' or 'Guidelines'). *See* 18 U.S.C. § 3742(e). Now, instead, we review the district court's sentence for 'reasonableness.' *Booker*, 125 S.Ct. at 765-66. Also, whereas the district court was previously *required* to sentence according to the Guidelines, the Guidelines are now 'effectively advisory.' *Id.* at 757." *United States v. Menyweather*, *supra*, 431 F.3d at 694.

The Circuit Court there endorsed imposing a lower sentence, based on mitigating

factors, even though they were not identified in the PSR, and found such mitigating factors to

be a valid basis for "imposing a sentence lower than the sentence recommended in the PSR."

(*Id.*)

As the Supreme Court pointed out in *Booker*, § 3553(a) makes the Guidelines

sentencing range a required consideration, *see* § 3553(a)(4), but "permits the court to tailor the

sentence in light of other statutory concerns as well." *Booker*, 125 S.Ct. at 757.

In *Menyweather*, the Ninth Circuit made it clear that even if a Defendant does not

qualify for a downward departure under the Guidelines, the District Court is still permitted to

impose any sentence that is not unreasonable.

> "Alternatively, even if we were to accept the government's argument that the district court erred by departing on this basis under the Guidelines, we can say confidently that any error would be harmless to the government in this case. * * *[¶]  In the 'broader appraisal,' [Fn.Om.] available to district courts after *Booker*, courts can justify consideration of family responsibilities, an aspect of the defendant's 'history and characteristics,' 18 U.S.C. § 3553(a)(1), for reasons extending beyond the Guidelines. 'District courts now ... have the discretion to weigh a multitude of mitigating and aggravating factors that existed at the time of mandatory Guidelines sentencing, but were deemed "not ordinarily relevant," such as age, education and vocational skills, mental and emotional conditions, employment record, and family ties and responsibilities.' *United States v. Ameline*, 409 F.3d 1073, 1093 (9th Cir.2005) (en banc) (Wardlaw, J., concurring in part and dissenting in part) (emphasis added)." *United States v. Menyweather*, *supra*, 431 F.3d 692, 700.

---

[7] "During this period, she used her government credit card and other peoples's cards for almost three years to steal over $435,000--that the government has been able to verify-- and faked certifications and computer entries to cover up her thefts.  Yet she has not been sent to prison." *Id.*, at p. 702, Dissenting Op., Kleinfeld, J.

In *Menyweather*, the District Judge cited the defendant's "family situation" as a major reason for imposing a non-custodial sentence. Here, this Court is asked to impose a non-custodial sentence to allow Mr. Habermann to continue in his ongoing program of rehabilitation. The Court is asked to consider the 18 days in jail he has already served and the pronouncements of the United States Supreme Court and the Ninth Circuit Court of Appeals that probation and home confinement serve the goal of punishment. See *Kimbrough*, *supra*, and *United States v. Ruff*, *supra*.

Here, as in *Menyweather*, this Court can and should consider the facts relating to Defendant's family and the relationship between those issues and his offense conduct.

In *Kimbrough*, *supra*, the Supreme Court held that the mandate of Section 3553(a) that the district court shall impose a "sentence [which is] sufficient but not greater than necessary, to comply with the purposes set forth in the statute" is the "overarching" principle of federal sentencing after *Booker*. See *Kimbrough*, 128 S.Ct. at 570. See also *United States v. Cawthorn*, 429 F.3d 793, 802 (8th Cir. 2005) ["district courts's duty" is to "impose a sentence sufficient but not greater than necessary" to serve the goals of punishment]; *United States v. Klups*, 514 F.3d 532 (8th Cir. 2007) [this provision is "mandatory."]

By imposing a sentence of 3 years of Probation, 18 days in jail (time served), home confinement (instead of incarceration) for 6-12 months, and the other conditions recommended by the Probation Officer, the Court would be serving all of the goals of punishment, without interfering with his ongoing rehabilitation.

**4.**

**<u>Extraordinary Acceptance of Responsibility</u>**

In the present case the Defendant has clearly fully accepted all responsibility for his involvement in the crime(s) charged. See Apology letter to victim, Congressman McDermott, his family and Staff and Statement of Acceptance of Responsibility by Charles Habermann, Attached as Exhibits 15 and 16 respectively. In this regard, the Government waves the "victim impact statements" before this Court as a strong reason to further punish Mr.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 33

Habermann, citing to the harm he has caused to his "victims."   Technically, his "victims" are the Congressman and his family and there is no evidence these two drunk calls to his Seattle office had any effect on him or his family.   However, these letters sound as though the Government has withheld from the Congressman's staff the fact that the Government concedes to this Court – after an investigation, the FBI found no sign that Mr. Habermann is dangerous or ever had any plans to hurt anyone.   The Government implies this was a long investigation and that these staffers may have had legitimate fears during the time it took the FBI to determine Mr. Habermann was not dangerous, however, the facts belie this view.   The Government has provided the defense with no discovery suggesting the FBI investigation in this case lasted more than several hours.   The FBI was notified about the calls to Congressman McDermott's Seattle office in the morning on December 10, 2010, and by that evening the FBI appeared at Mr. Habermann's Palm Springs apartment.    They left that apartment convinced Mr. Habermann posed no threat to anyone.   If the Government did not tell the Congressman's staff of their conclusions they should not lay that at the feet of the Defendant.   Moreover, the Government apparently did not even decide to charge Mr. Habermann until *after* the horrific shootings in Arizona, as there is no further discovery about post December 10, 2010 investigation that would lead the Government to change its reaction to Mr. Habermann's drunk calls from a warning to an indictment.   Please see <u>Declaration of William J. Kopeny</u>, Exhibit 22.

It is fairly clear that the Government conferred with the Congressman's staff to ensure that they wrote victim impact statements for the Probation Officer, but that the Government chose not to tell them what it has conceded to this Court – that Mr. Habermann is not and never was dangerous, that he never posed any actual threat to them.

Moreover, because the Arizona shootings took place just five weeks after Mr. Habermann's calls in this case, it is more likely that any real apprehension or fear on the part of the staff who wrote victim impact letters was based on that shooting, not on the two drunk calls by Mr. Habermann.

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    Mr. Habermann's plea agreement, his statements and letter of apology not only

2    constitute acceptance of responsibility, in the context of his aggressive work to root out the

3    problem that led him to commit this crime, they represent extraordinary acceptance. While

4    many offenders may admit what they have done to violate federal law, few indeed can

5    demonstrate that they have been working on a daily basis to eliminate the personal problem(s)

6    that led them into the conduct in the first place.

7        The sentence requested here would also constitute sufficient punishment for Defendant

8    in this case in view of the time he has already served, and the other factors discussed above,

9    and his show of remorse.

10                                              **5.**

11            **A Probationary Sentence is Consistent With the Goal of**

12                        **Avoiding Disparity in Sentencing**

13        Section 3553 also requires a sentencing court to avoid unwarranted disparities in

14    sentencing.    In this case there is a ready comparison between the Defendant here and a

15    recently sentenced defendant who also pled guilty to a single count of making a threat to a

16    federally elected official - the Defendant in *United States v. Wilson*, CR10-130JCC.

17        The Government recommends a sentence of one year and a day in this case, however,

18    that sentence would result in treating significantly different cases with the same sentence.

19    Specifically, Charles Wilson pled guilty to threatening Senator Murray in violation of the same

20    statute charged in the present case. His offense conduct took place in March of 2010,

21    however, Mr. Wilson's offense conduct is more culpable than that of Mr. Habermann.

22        In the following significant respects, Mr. Wilson's case is more serious and deserving

23    of punishment than is the Defendant in this case.

24        Specifically: (1) Mr. Wilson called his victim repeatedly and threatened to kill her

25    repeatedly over a period of approximately 13 days (See Exhibit 19, Complaint United States

26    v. Wilson, pp. 3-7), while Mr. Habermann only called Congressman McDermott over a ten

27    minute period; (2) Mr. Wilson called and threatened his victim 15 times (Exhibit 19, pp. 3-7),

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 35

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

while Mr. Habermann called his victim only twice in two calls, ten minutes apart; (3) Mr.

Wilson took efforts to prevent the authorities from identifying him, by blocking his phone

number (Exhibit 19, p.3, ln.1), while Defendant here gave his true name and true phone

number on his calls; (4) Mr. Wilson threatened an official that had his office near by Wilson's

home (Ex. 19, p. 8), whereas Mr. Habermann called to the office of his victim in Seattle from

his home two states away in Palm Springs, California; (5) Mr. Wilson identified the

movements of his victim in his calls and claimed to be at one of her public events in the home

town of Mr. Wilson (Ex. 19, p. 7), stalking her, while Mr. Habermann focused on his dislike

of his victim based on issues; (6) Mr. Wilson told undercover officers that he *regularly* carried

the .38 cal. hand gun he was licensed to carry (Ex. 19, p. 9), and that he would use it to shoot

his victim, while Mr. Habermann never has owned or possessed any deadly weapon, and has

never entertained actually shooting or killing anyone; (7) It took the FBI several days to

identify Mr. Wilson because he took steps to conceal his identity, while the FBI was able to

confront Mr. Habermann at his Palm Springs apartment within hours of his calls to

Congressman McDermott; (8) Once FBI agents found and interacted with Mr. Wilson in an

undercover manner (Ex. 19, p. 8), and learned he always carried his firearm and heard him

repeat his threat to kill his victim, they arrested him immediately, fearing he posed a serious

threat to his victim, but after the agents interviewed Mr. Habermann and conducted a

consensual search of his home, and heard his apology, they did not arrest him but left him at

large with a warning; (8) the investigation to identify and determine that Mr. Wilson was

probably not dangerous took many days and multiple agents, while the investigation of Mr.

Habermann took several hours; (9) Mr. Wilson was arrested and charged by Information

immediately, while Mr. Habermann was not charged until *after* the tragedy in Tucson, Arizona

involving Representative Gabrielle Giffords; (10) While Mr. Habermann has shown that his

conduct was the result of his alcohol problem, Mr. Wilson merely "had a variety of health

problems" (Exhibit 20, Government's Wilson Sentencing Brief, pp. 4-5); and (11) While Mr.

Habermann has undertaken a serious and difficult program of therapy and rehabilitation, Mr.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 36

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1  Wilson identified no problem leading this his crime, submitted no expert opinion to the Court

2  that would mitigate his conduct, and embarked on no program of rehabilitation.  (See

3  generally, Exhibits 19, 20, and 21, the Wilson sentencing briefs for the Government and the

4  defense and the initial Complaint outlining the facts of the Wilson case.)

5      Defendant submits that consistent with the Court's statutory obligation to avoid

6  disparities in sentencing similar defendants differently, the Court also should be cognizant of

7  the mitigation present in one case compared to another in which the same charge is involved.

8      The Government made virtually the same argument in their Wilson sentencing brief as

9  they have made in the present case.   In addition to all of the above ways Mr. Habermann is

10  different from Mr. Wilson, his Guideline range was Level 17, because unlike the present case

11  his crime clearly involved more than two (in fact many more than two) threats.  Nevertheless,

12  in the Wilson case, as here, the Government has argued for the same sentence, one year and

13  a day.  Mr. Wilson was in fact sentenced to one year and a day.

14      The factors that the Government cited in the Wilson case to support its argument for

15  a below the Guidelines sentence there were: (a) Wilson has no criminal history points; (b) he

16  has a "variety of physical health problems"; (c) he was "cooperative upon his arrest and

17  expressed remorse for his actions"; and (d) he conducted himself appropriately during pre-trial

18  release.  Finally, he was "evaluated and determined to be a low risk for violent behavior in the

19  future.[8] Exhibit 20, <u>Government's Wilson Sentencing Brief</u>, pp. 4-5.

20      By comparison, Mr. Habermann's situation is far more mitigated.  His offense involved

21  alcohol.  He is being treated for that addiction, and he is succeeding.  His mental health

22  therapist reports he is not likely to re-offend and he is making excellent progress in his

23  program of rehabilitation.  He has been alcohol (and marijuana) free for nearly 8 months.  He

24  had no weapon to surrender.   Like Wilson, also, Mr. Habermann "has no criminal history

25  points"; he has both mental and physical problems; and he was cooperative upon being

26

27      [8] Neither the Government nor the Defense sentencing brief in Wilson identifies the

28  source of this evaluation.  See Exhibits 20, 21.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 37

confronted and interviewed by the FBI, voluntarily submitting to a search of his home.   With

one exception, not related to either flight risk or danger, Mr. Habermann has also conducted

himself appropriately during pretrial release, and on that one occasion, two different United

States Magistrate Judges determined that he should be re-released on the same terms and

conditions.  Those bench officers' confidence and trust in Mr. Habermann have been proven

to be justified by Mr. Habermann's appearance in this District for the violation hearing, and

his appearance again in this Court for sentencing.  As discussed above, Mr. Habermann has

actually shown that he is very committed to complying with all orders and rules of probation

or supervised release, and his is fully aware of the consequences of not doing so.  See

generally, Exhibit 23, and especially Defendant's statement to the Court, at pp. 13-14.  In this

same hearing his local supervising Pretrial Services Officer expressed no objection to his being

re-released on the same conditions and affirmed he was generally in compliance.  Moreover,

the U.S. Probation Officer also states:

> "Lastly, the probation office is recommending voluntary surrender in the case.
> The defendant has been on bond with U.S. Pretrial Services supervision since
> January 2011, and he has generally complied with all of his conditions,
> including location monitoring and drug testing.  Furthermore, he continues to
> participate in mental health counseling with Dr. Leitman and appears to be
> doing well."  PSR Sentencing Recommendation, p. 5, last full paragraph.

The Government asks for Defendant to be remanded at sentencing without giving any

reasons at all, and this Court is asked to reject that suggestion, should any custody sentence

be imposed.

**6.**

**A Sentence of 18 days (Time Served) and 3 Years Probation
on the Conditions Recommended in the Probation Report
Sentencing Recommendation Will Serve all of the Goals of
Sentencing**

The goals of federal sentencing include:  (a) the need to punish the offender for his

conduct; (b) the requirement of restitution; (c) furthering the rehabilitation of the defendant;

and (d) specific and general deterrence.  18 U.S.C. § 3553.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 38

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    In the present case, all of these goals will be served by sentencing Mr. Habermann to

2  a sentence of "time served" and Probation on the conditions set forth in the PSR because:

3    (a)    Punishment

4    He has already served nearly 18 days in jail and nearly 8 months in home confinement

5  with a GPS ankle locator.   This has been true "punishment" for several reasons, including (1)

6  while he was deprived of his freedom, Mr. Habermann was unaware of or when he might be

7  released; (2) while incarcerated, he was fearful and anxiety ridden because of his diagnosed

8  extreme anxiety disorder; and (3) on home confinement he has been prevented from even

9  staying within the confines of his fenced in Apartment by sitting outside by the swimming

10  pool, where he requested but was denied permission to go to smoke,[9] because the Seattle

11  Pretrial Officer views "home detention" as punishment, "detention."   See Exhibit 22,

12  Declaration of William J. Kopeny.

13    (b)    Restitution

14    Similarly, the sentence suggested by Defendant will serve the goal of restitution.  Mr.

15  Habermann has recommended to the Government, from the beginning of his representation,

16  that he would be willing to not only pay a fine, but pay the expenses of the Government

17  investigation and he is also willing to pay for any security measures taken by Congressman

18  McDermott's office that were actually the result of his call (as opposed to general

19  improvements in security after the Arizona shooting of Congresswoman Giffords and 18

20  others).   He will immediately pay all restitution and any fine imposed as a condition of

21  probation.

22    While he recognizes that punishment is appropriate, paying a fine is punitive by

23  definition, and for this Defendant it will be punitive because he is focused in his daily work

24  on money and having to pay a large lump sum will be punishing for him in particular.   He

25  knows the value of this money and will pay it promptly.

26

27  _____

28    [9] Mr. Habermann was allowed to smoke, just not go to the pool.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 39

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    (c)    Rehabilitation

2    Mr. Habermann has provided this Court with convincing evidence that he is now

3    embarked on a program of rehabilitation and that incarcerating him (even for six months) will

4    interrupt that progress, damage the work that had been done, and delay his ultimate success.

5    This goal is explicitly approved in the authorities cited above as a sound reason for not

6    incarcerating a defendant who is in the midst of a program of rehabilitation. The report of Dr.

7    Leitman shows that Mr. Habermann started seeing his therapist twice a week in January and

8    now (for the past several months) see him three times a week.

9    Mr. Habermann fully understands that he has more work to do, but that he has already

10    begun to turn the corner on his alcohol addiction, by remaining alcohol free for nearly 8

11    months, while actively participating in therapy on a positive basis.

12    He knows he cannot and will not ever again act in a cavalier way toward any other

13    human being. He is ashamed of the harm he has caused to the victims in his life, including the

14    victims in this case, but also including those close friends and family members who had to

15    suffer with him when he would drink and act and speak out of anger.

16    He also understands the importance of taking responsibility for his own conduct.

17    Mr. Habermann did not attempt to claim innocence and to blame the alcohol but

18    forthrightly pled guilty to what he did – threaten a Congressman with the requisite intent that

19    the threat be taken seriously.   He did not make similar criminal threats to anyone else,

20    however, because those other unpleasant calls did not carry with them a subjective intent to

21    threaten.

22    He has been in jail, and he knows that even if probation is granted, there is more

23    "punishment" ahead. He will embrace the community service and pay any fine ordered. He

24    will continue to work every day with the therapist with whom he has bonded (Dr. Leitman)

25    in his program of treatment and rehabilitation. He is willing to pay restitution as noted above,

26    and he knows that the federal sentencing model treats restitution as both "punishment" (i.e.,

27    to deprive the accused of something.) and "rehabilitative" (because it teaches the accused how

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 40

it feels to have to give something up to make up for the harm he has caused).  He knows that this Court may impose home detention for some or all of the sentence it fixes, and he further understands that the Courts have recognized that there is a punitive aspect to supervised release and home confinement.  (See *Kimbrough*, *supra*, 128 S.Ct. at 595-598 [supervision following conviction is a substantial punishment].)

Moreover, Mr. Habermann knows that he is a different person now than before he embarked on the conduct that brought him before this Court, and that although he is no longer drinking he is still the person who did those things.  He must still live with, understand and make up for all of his past transgressions, and his rehabilitation is an ongoing process, which he believes he will continue to be successful in with the help of the supervision that will come with his sentence.

 

 

 

(d)    Deterrence

The statutory goals of punishment include both "specific" and "general" deterrence. Specific deterrence refers to the individual involved – will the sentence imposed deter him from ever re-offending?  In this case, the facts and opinions of the experts and those from the community who have known Mr. Habermann as he has gone through the start of his rehabilitation over the past seven months all agree that he will never re-offend.

Most significantly, a highly qualified expert, Dr. Leitman, recommends a probation-type of sentence based on his own predictive expertise, and addresses why this model would be preferable to an in-patient program and much preferable to incarceration.

In addition, one of the letters to this Court comes from a former New York City Police Officer who is obviously brilliant (having graduated from Harvard University, Columbia University in New York, and the University of Chicago School of Law) who has known Mr. Habermann for over 18 years.  See Exhibit 4, Letter from Martin Breiner.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 41

WILLIAM J. KOPENY
8001 IRVINE CENTER DR., STE. 400
IRVINE, CALIFORNIA 92618
(949) 754-2944

1    He believes Mr. Habermann should be granted probation and required (and permitted)

2    to continue on his current path of rehabilitation and treatment.

3    Please see Exhibits 4, and 2 <u>Report of Dr. Leitman</u>.

4    Besides Mr. Breiner and Dr. Leitman, all the others who have addressed this Court in

5    the attached Letters believe he has been incarcerated enough and that he will perform well

6    should he be sentenced to some form of non-custodial supervision.  For example, Whitney

7    Oppenheimer, Defendant's sister writes that Charlie is honest and never denies what he does.

8    He "never tries to hide or lie about anything."  She is not surprised he left his name and phone

9    number when he called Congressman McDermott because of this, and she ends her letter with

10   the following:

11   "The experience of spending time in jail has had a profound impact on Charlie.

12   I believe that he will do anything to never spend another night in jail again. * *

13   * I believe that he's determined to stop drinking and can do so if he has

14   support."  Exhibit 8, <u>Letter of Whitney Oppenheimer</u>.

15

16   The question of general deterrence, however, is a more complex issue – because a court

17   is required to consider whether the sentence to be imposed will deter others similarly situated

18   to the defendant from deciding to commit a similar offense.

19   Obviously, the entire concept of deterrence assumes a potential offender who is capable

20   of making a choice, or else he or she could not ever be deterred.  But, assuming a person, who,

21   like Mr. Habermann, is intoxicated in the extreme when the idea of making a call is presented,

22   it would be sufficient deterrence to show such an offender that he will face certain

23   incarceration if he either: (a) refuses to obey rules of his supervision; or ( b) refuses to stop

24   drinking.   Mr Habermann's experience has shown this Court that he enthusiastically will

25   embrace compliance with any and all rules imposed and that he has stopped drinking and never

26   intends to drink or abuse (legal or illegal) drugs again.

27

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 42

1    While this Court must *consider* these goals, it must also always remember to impose
2    the <u>least</u> sentence necessary to achieve them.  *Kimbrough*, *supra*, 128 S.Ct, at 570.

3    Finally, there are many precedents in which defendants convicted of similar or more
4    aggravated threatening conduct have receive probationary sentences.

5    Over the past five decades, which saw the assassinations of several national leaders,
6    numerous persons convicted of making "true threats" against politicians or others for political
7    or religious reasons have received probation sentences.  For example, In *United States v.*
8    *Morales*, 272 F.3d 284 (5th Cir. 2001), a defendant was convicted of making a "true threat" in
9    interstate commerce and sentenced to 24 months probation.  Furthermore, in *United States v.*
10   *Anderson*, 14 Fed. Appx. 23 (2d Cir. 2001) [unpublished], the defendant was convicted of
11   sending a threatening letter to an attorney to extort him and was sentenced to three years
12   probation on condition he serve 6 months in home confinement.  See also *United States v.*
13   *Khorrami*, 895 F.2d 1186 (7th Cir. 1990) [defendant sentenced to three years probation and
14   rehabilitation for multiple threats against a Jewish organization]; *United States v. Stengal*, 872
15   F.3d 431 (9th Cir. 1989) [defendant convicted of threatening a law enforcement officer from
16   the IRS, defendant said he really intended to threaten him and that he'd shoot anyone from the
17   IRS who came to his door.  He was sentenced to 3 years probation and fined $500.]; *United*
18   *States v. Murray,* 826 F.2d 1061 (4th Cir. 1987) [Defendant convicted of threatening to kill the
19   president of the U.S. sentenced to five years probation on condition he undergo psychiatric
20   treatment]; *United States v. Robin*, 693 F.2d 376 (5th Cir. 1982) [defendant convicted of
21   threatening to kill the President received two years suspended sentence and probation]; *United*
22   *States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976) [Defendant convicted of threatening to kill
23   Yassir Arafat sentenced to probation and a $1,000 fine]. *United States v. Compton*, 428 F.2d
24   18 (2d Cir. 1970) [Defendant convicted of threatening to kill President Nixon given a
25   suspended sentence and placed on three years probation].

26   Under the circumstances of the present case, these goals will all be served by a sentence
27   of 18 days(or time served) and release on (Supervised Release or) Probation with appropriate

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 43

conditions.  As such, this constitutes yet another reason for this Court to impose a sentence lower than that minimum Guideline sentence and to follow Defendant's sentencing recommendation.

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 44

**WILLIAM J. KOPENY**
**8001 IRVINE CENTER DR., STE. 400**
**IRVINE, CALIFORNIA 92618**
**(949) 754-2944**

1

## IV.

2

## CONCLUSION

3       Defendant should be sentenced to time served (18 days in jail) and placed on supervised

4  release or probation on any reasonable conditions including, if the Court deems it appropriate:

5  6-12 months of home confinement.

6       This sentence will meet but not exceed that necessary to serve all of the goals of

7  sentencing under 18 U.S.C. § 3553(a), because it will allow Mr. Habermann to continue in his

8  program of rehabilitation, which would be interrupted and set back if he is incarcerated.

9  Dated: August 8, 2011

10                                              Respectfully submitted,

11

12                                                    /S/

13                                     _____
                                       WILLIAM J. KOPENY
                                       8001 Irvine Center Drive, Suite 400
14                                     Irvine, California 92618
                                       Telephone: 949-754-2944
15                                     Facsimile: 949-754-2912
                                       California State Bar No. 661764
16

17                                              Respectfully submitted,

18                                                    /S/

19
                                       _____
20                                     JENNIFER HORWITZ

21                                     Counsel of Record for Defendant
                                       CHARLES TURNER HABERMANN
22

23

24

25

26

27

28

**DEFENDANT'S SENTENCING MEMORANDUM**
(*United States v. Charles Turner Habermann*, Case No. CR11-29JLR) - 45

                                                      WILLIAM J. KOPENY
                                                      8001 IRVINE CENTER DR., STE. 400
                                                      IRVINE, CALIFORNIA 92618
                                                      (949) 754-2944